Exhibit 1



```
                **UNCERTIFIED ROUGH DRAFT**

                  DEPOSITION OF DANI CHEHAK
```

The following transcript of proceedings, or any portion thereof, in the above-entitled matter, taken on May 22, 2025, is being delivered UNEDITED and UNCERTIFIED.

The purchaser agrees not to disclose this uncertified and unedited transcript in any form (written or electronic) to anyone who has no connection to this case.  This is an unofficial transcript, which should NOT be relied upon for purposes of verbatim citation of testimony.

This transcript is not checked or proofread.  It is a draft transcript, and NOT a certified transcript.  This may contain computer-generated mistranslations, including inaccurate or nonsensical word combinations, or symbols which cannot be deciphered.

Corrections will be made in the preparation of the certified transcript, resulting in differences in content, page and line numbers, punctuation and formatting.



(800) 528-3335   NAEGELI DEPOSITION & TRIAL  Established 1980   NAEGELIUSA.COM

1  question that you need to review it, you let me
2  know.
3      A.  Okay.  So there's three things.  Steve
4  starts an e-mail, Laura responds.  Steve, it goes
5  in that.
6      Q.  That's right.
7      A.  Okay.
8      Q.  That's right.
9      A.  Okay.  Let me get the context of how it
10 started.
11     Q.  All right.  Ms. Chehak, in Exhibit 45,
12 the top e-mail on the thread is a April 29, 2024,
13 e-mail from Steve Teixeira?
14     A.  Yeah.
15     Q.  And in this e-mail, Mr. Teixeira
16 complains about discrimination he's encountered
17 due to his cancer.
18     A.  Uh-huh.
19     Q.  Do you recall that?
20     A.  Yes.  It's written.
21     Q.  And in response to that discrimination
22 complaint, did you instruct anyone to investigate?
23     A.  The legal team.
24     Q.  And did you hire an outside investigator?
25     A.  The legal team would be the one to answer

1  that question.
2      Q.  Well, I don't want to know about your
3  communications with the legal team, but I want to
4  know if an outside investigator was hired?
5      A.  Yes.
6      Q.  Do you know who that was?
7      A.  Yes.
8      Q.  Who was it?
9      A.  DLA.
10     Q.  Do you remember who the contact was at
11 DLA?
12     A.  The legal team could tell you that.
13     Q.  When did that happen?
14     A.  Very quickly after this e-mail.
15     Q.  After the April 29, e-mail?
16     A.  After the claim of discrimination, yes.
17 I went to the legal team, and they'd be best able
18 to tell you the date of -- of hiring someone.  I
19 don't know.
20     Q.  If you look at the first e-mail on the
21 thread, which I told you we wouldn't do.  But if
22 you'll take a moment now --
23     A.  Okay.
24     Q.  -- to look at it.  Actually, set that
25 aside.  I changed my mind.

```
 1         A.   Okay.
 2         Q.   Are you aware whether the -- an
 3    investigator was hired before or after
 4    Mr. Teixeira was placed on administrative leave
 5    around May 23?
 6         A.   I am not.
 7         Q.   And who would know that?
 8         A.   The legal team.
 9         Q.   When do you say the legal team, are you
10    talking about the external legal team or the in
11    house lawyers?
12         A.   The in house lawyers.  Sorry.  I'm
13    pointing because they're at the end of the table.
14         Q.   Right -- right.  Is there anything else
15    you did to respond to this discrimination
16    complaint for Mr. Teixeira?
17         A.   Yeah I made sure that w e got our legal
18    team working on the claim.
19         Q.   Anything else?
20         A.   No.
21         Q.   Did you discuss it with anyone else in
22    your department?
23         A.   No.
24         Q.   Did you discuss it with Ms. Chambers?
25         A.   That would have been for the legal team
```

1  to move forward.
2       Q.  I see.  In your experience as an HR
3  professional and a chief people officer, is it
4  unusual for there to be an investigation of a
5  discrimination complaint without talking to the
6  complainant?
7       A.  No.
8       Q.  That happens?
9       A.  Is it unusual?
10      Q.  Yes.
11      A.  And I said no.  All right.  Hold on.  Is
12  unusual for it to not --
13      Q.  Let me start.
14      A.  Two negatives.
15      Q.  There's a double negative.
16      A.  It's okay.  Let's --
17      Q.  Yeah.
18      A.  We'll break it down.
19      Q.  Yeah.  In your experience as an HR
20  professional and the chief people officer --
21      A.  Right.
22      Q.  -- is it typical when investigating a
23  discrimination complaint that the complainant be
24  interviewed?
25      A.  Yes.

```
 1        Q.   And it would you find it very unusual for
 2   that not to happen?
 3             MR. TODARO:  Object to form.
 4   BY MR. HARRINGTON:
 5        Q.   If you understand that question.
 6        A.   Okay.  I would find it usual that would
 7   happen.  I would find it unusual when it didn't.
 8        Q.   And do you know why that did not happen
 9   in this case?
10             MR. TODARO:  Objection.  And you can
11   answer to the extent you can answer without
12   revealing conversations you've had with Counsel.
13             THE DEPONENT:  Yeah.  So I don't.
14             MR. TODARO:  If you have an
15   understanding -- if you have an understanding
16   independent of a conversation with Legal Counsel,
17   then you can answer.
18             THE DEPONENT:  I -- I don't have any
19   understanding independent of Legal Counsel.
20   BY MR. HARRINGTON:
21        Q.   Have you ever been involved in an
22   investigation of a discrimination complaint where
23   the complainant was not interviewed?
24        A.   No.
25        Q.   Would you consider that inconsistent with
```

1  best practices for HR?
2          MR. TODARO:  Object to form.  Foundation.
3  Incompletely hypothetical.  Go ahead.
4  BY MR. HARRINGTON:
5      Q.  You may answer.
6      A.  Would you repeat it?
7      Q.  Would you consider an investigation of a
8  discrimination complaint that does not interview
9  the complainant inconsistent with best practices
10 for HR?
11         MR. TODARO:  Same objection.
12         THE DEPONENT:  If HR is doing the
13 investigation, we would have interview -- we
14 interviewed the complaint as well.  Yes.
15 BY MR. HARRINGTON:
16     Q.  And that's a best practice?
17     A.  Yes.
18         THE REPORTER:  Exhibit 63 marked.
19 BY MR. HARRINGTON:
20     Q.  Ms. Chehak, you've been handed Exhibit 63
21 to your deposition.  In this exchange, by text
22 message between you and Ms. Chambers, you write,
23 "Just got done with Golf and have Steve at 3:30.
24 Saw the e-mails, Ray Slack Exchange.  Point of no
25 return for Steve." Did I read that correctly?

```
 1   I mean, your time with the company started --
 2        A.   In November of 2022.
 3        Q.   Was TK Law retained prior to 2022?
 4        A.   Prior to my November of 2022.  Okay.
 5        Q.   I understand that.  My question to you
 6   is, do you know whether TK Law was retained prior
 7   to 2022?
 8        A.   I don't -- I don't know.
 9        Q.   Okay.  So TK Law was at least engaged by
10   Mozilla Corporation for three months that we know
11   of when you were on the job?  Plus an unknown
12   number of additional months?
13        A.   I think that's right.
14        Q.   Do you know if the scope of that
15   engagement changed over time?
16             MR. TODARO:  You can answer that, yes or
17   no.
18             THE DEPONENT:  No.
19   BY MR. HARRINGTON:
20        Q.   It did not change over time, or you don't
21   know?
22        A.   I don't know.
23        Q.   Do you know if TK Law generated a report?
24        A.   Yes.
25        Q.   And who received that report?
```

1      A.  It went to Mitchell, and I believe
2   Carlos.
3      Q.  Anyone else?
4      A.  No.
5      Q.  Did you ever see the report?
6      A.  I saw it after that.
7      Q.  Okay.  My question earlier was, who did
8   the report go to?  You answered Mitchell and
9   Carlos?
10     A.  Yes.
11     Q.  It also went to you?
12     A.  Mitchell and Carlos shared it with me.
13     Q.  I see.  Who all has seen the report?
14     A.  Mitchell, Carlos, me, and lastly Gray,
15  which was Mitchell's Chief of Staff.
16     Q.  Was the existence of the retention of TK
17  law known to people at the company generally
18  outside of leadership?
19         MR. TODARO:  Object to form.  Foundation.
20  You can answer if you know.
21         THE DEPONENT:  Yeah.  Can you tell me
22  again?  Was the existence?
23  BY MR. HARRINGTON:
24     Q.  Yeah.  Yeah.  I guess what I'm asking is,
25  were the rank and file employees aware that the

1  company had retained a law firm to report on
2  DEI-type issues?
3       A.  My -- my experience is, yes, that that
4  Mitchell was very transparent in that?
5       Q.  Yes.  Did everyone at the company know
6  about this?  I mean, was it announced it in all
7  hands?
8       A.  I wasn't there.  So -- so I don't know.
9       Q.  Was it ever discussed in a company-wide
10 setting or written about in a company-wide setting
11 while you were there?
12      A.  Yes.
13      Q.  Okay.  And what setting was that?
14      A.  I think probably in what we call
15 leadership forums, which are where employees can
16 ask questions.  Is probably where it was
17 discussed?
18      Q.  Yes.  And what was the discussion?
19      A.  I think along the lines of, is TK still
20 here doing this work is, you know, people were
21 interviewed for the work, I understand, you know,
22 what's the next step.  So I think it was really
23 the logistics of it.
24      Q.  That the logistics of it were shared with
25 the rank and file of the company.  Was there an

```
 1   expectation that the -- some sort of result or
 2   report would be shared with the company more
 3   broadly?
 4            MR. TODARO:  Object to form.
 5            THE DEPONENT:  I don't know what the
 6   original expectation was or -- or what Mitchell's
 7   expectations and agreement was or vision for it.
 8   So I don't know.
 9   BY MR. HARRINGTON:
10       Q.  Was there an expectation among the
11   employees at the time that you did work for the
12   company that you were aware of that some sort of
13   result from the TK law report or from TK Law would
14   be shared with the company more broadly, beyond
15   management?
16            MR. TODARO:  Object to form.  Foundation.
17   Go ahead.
18            THE DEPONENT:  Again, I don't know what
19   their expectation was.  And so when I -- when I
20   think about your question, is there an expectation
21   by the employees?  That the results would be
22   shared?  Is that your question?
23   BY MR. HARRINGTON:
24       Q.  Some sort of result or information from
25   TK Law would be shared with the company?
```

1    A.  I'd say I think there was expectation
2  that if there was something we could do better,
3  we'd do it better.
4    Q.  Well, I guess I'm -- I'm asking about
5  some sort of work product or some sort of report
6  or some sort of result or some sort of information
7  coming out of TK Law's work, that the expectation
8  was.
9    A.  That was me and my active listening.
10  Yeah, problem.
11    Q.  Based on what you knew when you were
12  employed, when you first started at the company,
13  and when you overlapped with the work of TK Law.
14  And based on what you heard in the context of
15  these public discussions that related to TK law,
16  did you understand there to be an expectation
17  among employees that some sort of result would be
18  shared with the employees?
19          MR. TODARO:  Object to form.
20          THE DEPONENT:  I think there were pockets
21  that -- that, yes, that was an expectation.  There
22  were pockets of employees that thought they would
23  see the information.
24  BY MR. HARRINGTON:
25    Q.  What made them think that?

```
 1        A.  I'm trying to --
 2        Q.  And it's I appreciate course.  Can if you
 3   can combine that to a yes or no answer?
 4             MR. TODARO:  If you know.
 5             THE DEPONENT:  So an asked the question
 6   again.
 7   BY MR. HARRINGTON:
 8        Q.  Were there facts reported upon in the TK
 9   Law report?
10             MR. TODARO:  Same instruction.
11   BY MR. HARRINGTON:
12        Q.  Based on its work based on the work of TK
13   Law?
14        A.  I don't know.
15        Q.  You've read the report?
16        A.  I did.
17        Q.  Were there facts reported in the report?
18             MR. TODARO:  Objection.  Asked and
19   answered.
20             THE DEPONENT:  I don't know.
21   BY MR. HARRINGTON:
22        Q.  Was there a summary of this report
23   created?
24        A.  Yes.
25        Q.  And did you prepare that summary?
```

```
 1        A.   I did.
 2        Q.   And who has now received that summary?
 3        A.   I shared the results that summary, the
 4   results with the steering company.
 5        Q.   Anyone else?
 6        A.   Most likely the People Business Partners.
 7        Q.   How many people is that?
 8        A.   Probably three people.
 9        Q.   And they are direct reports of yours?
10        A.   They are.
11        Q.   When was this summary of the TK Law
12   report distributed to the steering committee and
13   the People Business Partners?
14        A.   A long time ago.  When was that, maybe?
15   I'd be guessing big time.
16        Q.   During your first year of employment?
17        A.   Yes.
18        Q.   When you drafted the summary of the TK
19   Law report, was it reviewed by counsel before you
20   distributed to the steering committee and the
21   People --
22        A.   Business Partners.
23        Q.   Business Partners?
24        A.   Yes.
25        Q.   Did the summary that you prepared of the
```