# EXHIBIT 9



UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

STEVE TEIXEIRA,

    Plaintiff,

v.                                      Case No.: 2:24-CV-01032

MOZILLA CORPORATION a.k.a. M.F. Technologies, a California corporation; MOZILLA FOUNDATION, a California public benefit corporation; LAURA CHAMBERS and her marital community; WINIFRED MITCHELL BAKER and her marital community, and DANI CHEHAK and her marital community,

    Defendants.

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF

LAURA CHAMBERS

TAKEN ON

WEDNESDAY, MAY 21, 2025

8:40 A.M.

DLA PIPER US LLP

555 MISSION STREET, SUITE 2400

SAN FRANCISCO, CALIFORNIA 94105



1            THE REPORTER:  Attorney Touschner, do you agree to
2    move forward?
3            MS. TOUSCHNER:  Yes, I do.
4            THE REPORTER:  Attorney Redmond, do you agree to
5    move forward?
6            MR. REDMOND:  Yes, I do.
7            THE REPORTER:  Attorney Cates, do you agree to
8    move forward?
9            MS. CATES:  Yes, I do.
10           THE REPORTER:  Attorney Durham, do you agree to
11   move forward?
12           MR. DURHAM:  Yes, I do.
13           THE REPORTER:  Attorney Alexander, do you agree to
14   move forward?
15           MS. ALEXANDER:  Yes, I do.
16           THE REPORTER:  Attorney Weiskopf, do you agree to
17   move forward?
18           MR. WEISKOPF:  Yes.
19           THE REPORTER:  And is Attorney Text -- is that one
20   here?  Teixeira --
21           MR. HARRINGTON:  That's -- he's not an attorney.
22           THE REPORTER:  Oh, not an attorney.  Oh, that's --
23           MR. HARRINGTON:  He's the plaintiff.
24           THE REPORTER:  Perfect.  All righty.  Will the
25   witness please raise your right hand.

1      Do you affirm under penalty of perjury that the
2  testimony you're about to give will be the truth, the whole
3  truth, and nothing but the truth?
4           THE DEPONENT:  I do.
5           THE REPORTER:  Thank you.
6           THE VIDEOGRAPHER:  You may proceed.
7  LAURA CHAMBERS, having been first duly affirmed to tell the
8  truth, was examined, and testified as follows:
9  EXAMINATION
10 BY MR. HARRINGTON:
11      Q.   Good morning, Ms. Chambers.
12      A.   Good morning.
13      Q.   As you heard, my name is Mat Harrington.  I
14 represent the plaintiff, Steve Teixeira.  Can you state your
15 full name for the record, please?
16      A.   Yes.  Laura Robin Chambers.
17      Q.   All right.  And have you ever had your deposition
18 taken before?
19      A.   I have not.
20      Q.   All right.  Do you understand that you're under
21 oath?
22      A.   Yes.
23      Q.   And you've sworn to tell the truth today?
24      A.   Yes.
25      Q.   Is there any reason that you cannot give complete

1  preparing Steve's performance review, and so it was probably
2  around that context.
3      Q.   Okay.  So Mitchell provided and forwarded
4  information on to Dani --
5      A.   Yes.
6      Q.   -- for preparation of Steve's performance review
7  regarding 2023.
8      A.   As I said, I don't know why it was forwarded, but
9  at the time, we were preparing Steve's performance reviews,
10 so my guess is that that's why it -- she forwarded it to
11 Dani.
12     Q.   All right.  And do you know what other input
13 Mitchell Baker provided into Steve's performance review for
14 2023?
15     A.   I don't know if she forwarded other e-mails to
16 other people, obviously.  I think that I checked in with her
17 on the performance review.  I don't recall exactly, but it's
18 probably something I would have done. She oversaw Steve
19 during 2023.  I needed to write the review, and I was
20 gathering perspectives and advice on that, so I probably --
21 I don't know if I shared a draft with her or received her
22 input on it, but most likely, I did.
23     Q.   Because you didn't directly supervise Steve in
24 2023.
25     A.   That's correct.

1  referring to here with the new role?
2      A.   I don't recall exactly, but I think around March
3  15th -- I may have the date slightly off -- Steve had sent
4  me an e-mail, proposing a new role.  He said that he was
5  thinking that Ian should report to me directly, that he
6  could take on a title of something like -- SVP of new
7  products, I think was the proposal at the time.  And so
8  given the timing of this conversation, it was probably
9  referring to the e-mail that he had sent me.
10     Q.   Now, that e-mail references a conversation that
11 you and he had.  Do you remember a conversation before that
12 e-mail?
13     A.   If I recall the e-mail that Steve said, I think he
14 did refer to -- perhaps it was a previous one-on-one.
15     Q.   And you were the one that proposed a new role to
16 Steve Teixeira, correct?
17     A.   I don't think that I did.  I think that what I had
18 said is, hey, look, a lot has changed since you took on the
19 role.  Would you -- you know, do you want to think about
20 things differently?  I don't believe that I proposed a
21 smaller role in that conversation.
22     Q.   Are you certain?
23     A.   I'm fairly confident.
24     Q.   But you did say that a lot has changed.
25     A.   Yes.

```
 1       Q.    And what was the next thing you said?
 2       A.    Trying to remember.  I don't remember exactly what
 3  I said, but I think I said, you know, a lot has changed.  I
 4  can't remember the -- the rest of it, but I think I teed up,
 5  hey, do you want to think about whether this will still
 6  makes sense for you, or do you want to do something
 7  differently?  So I opened the door for a conversation.
 8       Q.    You can set that aside.  When you said a lot has
 9  changed and when you then opened the door to the
10  conversation about potentially a new role, in that
11  conversation you had with Steve Teixeira before March 15th,
12  what did you mean by "a lot has changed"?
13       A.    I can't recall what I meant at the moment, but let
14  me see if I can sort of list through some things that had
15  changed.  The first is that Steve had received some pretty
16  tough feedback, and so there was -- he was hopefully getting
17  clearer that there was some issues in his relationship with
18  the board that he needed to resolve on and et cetera.  So I
19  think that he had some information about his performance.
20  Also, you know, in the RIF, things had changed, right, in
21  Kodak, I should say.  So Moz Social was smaller.  Some other
22  teams were smaller.  I think that we had also talked about
23  the development of a new role, sort of a SVP of
24  infrastructure role that was taking some pieces of -- of
25  Steve's role.  That's something that I think he had come up
```

1     A.    Yes.
2     Q.    Under recommendation, you write, "Effective May
3  1st, 2024, Steve will move to the role of SVP technology
4  strategy for Mozilla, which will be an individual
5  contributor role.  This is a fixed-term role through the end
6  of 2024." That means that the proposal is he will be
7  terminated -- his employment will be terminated within eight
8  months, right?
9     A.    That is saying that this role would end at the end
10 of 2024.  It does not say that he would be terminated.
11    Q.    Well, what other role would he be in?  Are you
12 saying he would go back to the CPO -- CPO role?
13    A.    It was not defined at this time.
14    Q.    It was uncertain.
15    A.    It was not defined.
16    Q.    Did Mr. Teixeira understand that there would be no
17 defined role for him at the end of 2024 when you wrote this
18 e-mail?
19    A.    I'm not sure.  If we look at the timing of this e-
20 mail, April 18th, I'm not sure if he knew.  But also, we
21 need to get board approval before we present roles to
22 people, so this is a necessary step before presenting it.
23    ==Q.    A little bit further down in the compensation --==
24 ==compensation section, you write, "We will prorate the owed==
25 ==LTIP for time worked, four months, in 2024." So there was==

1  **LTIP owed to Steve at this time?**
2       A.   He had accrued LTIP.  LTIP is a bonus that -- paid
3  out at the discretion of the board.  So that was -- a
4  proposal was we were asking for board discretion in this
5  role to pay some element of it.
6       **Q.   Your position is that LTIP is discretionary.**
7       A.   The -- it is discretionary in two ways.  It is a
8  -- it's a bonus program.  So one element is if someone
9  leaves during the year, it's at the discretion of the board
10 or of the executive team, whether it's paid at all.  If it's
11 -- if they have had poor performance, it does not need to be
12 paid.  Also, the board has discretion at the percentage
13 payout.  That's usually decided at the start of the year.
14      **Q.   I'm sorry, the --**
15      A.   At the start of the year.  Sorry, my voice is
16 getting cracky.
17      **Q.   Is that memorialized anywhere, those two points?**
18           MR. TODARO:  Object to form.
19           THE DEPONENT:  I don't know quite how to say if
20 it's memorialized.  Certainly, the -- we have a track record
21 of the LTIP payments being approved by the board, so I think
22 that's memorialized.  I think that the LTIP in people's
23 documents is -- is quite clear on the fact that it's
24 discretionary and based on performance, but I'd have to look
25 at the -- the plan details for the --

1  BY MR. HARRINGTON:
2      Q.   Is -- is there a cause definition in the plan
3  details?
4      A.   I haven't looked at them recently, but I assume
5  there is.
6      Q.   You write that, at the end of that same bullet
7  point, the LTIP is subject to company performance, payable
8  upon termination, and has a survivorship clause.  In the
9  next bullet point, there's a discussion of a bonus.
10     A.   Sorry.  Where was that first -- oh, it was --
11 that's the -- one, two, three, four -- fourth bullet down.
12     Q.   That's right.  Same bullet we were in before. So
13 you write that the LTIP has a survivorship clause. In the
14 next bullet regarding a potential bonus, you write, there's
15 no survivorship element of the bonus program.  Why are you
16 making note of the survivorship clauses or lack thereof in
17 these two compensation components?
18     A.   I don't recall.
19     Q.   You're contingency planning in case he died?
20     A.   I don't recall.
21     Q.   So you don't recall?
22     A.   No.
23     Q.   What else could you be referring to here?  Any
24 idea?
25     A.   I actually don't know what the definition of a

1  cycle this January.  I don't believe anyone was paid out at
2  that low rate.  Prior to that, I know we had some executives
3  with performance issues.  It's quite possible some of those
4  got the lower payouts.  Often, what you do is if you have
5  decided that someone is underperforming, you will exit them
6  during the year so by the time you get to performance review
7  cycle, it's rare that someone is in the below achievement
8  category at the executive level.
9      Q.   All right.  So it's rare that someone would be in
10 the low achievement category at the executive level,
11 necessitating a bonus of 50 percent or lower?
12     A.   Yes.
13     Q.   Why did Mr. Teixeira not receive his LTIP bonus
14 for 2024?
15     A.   So as I mentioned before, the LTIP is
16 discretionary.  It's a bonus program.  When someone leaves
17 the company, they are not guaranteed a payout. Steve was
18 terminated in September for poor performance, and so it was
19 not incumbent on us to pay out any bonus performance --
20     Q.   Who made that --
21     A.   -- or, sorry, good performance bonus.
22     Q.   And it was the comp committee of the board that
23 made that decision?
24     A.   Potentially.  I'm just trying to think through
25 governance.  The comp committee typically looks over those

LAURA CHAMBERS                              May 21, 2025                              242
84535                                                                        Confidential

1  things.  I can't recall exactly in this instance.
2        Q.   I'm sorry, you're not sure who makes the decision
3  whether to pay out LTIP bonuses or not?
4        A.   I'm very clear in the normal cost of business.
5  That's a discussion that happens at comp committee.  In the
6  case of termination, I'm pretty certain that the board is
7  not involved.  We don't -- just to be super clear, we don't
8  pay out LTIPs when people are terminated.  Sometimes we will
9  do a sort of a severance payout, but it is not an LTIP
10 payout.
11       Q.   And that's decided by management, not by the
12 board.
13       A.   Yeah, that's my belief and understanding.
14            THE REPORTER:  Was that a yes?
15            THE DEPONENT:  Yes.  I'm not 100 percent sure. The
16 board does look over comp for executive, so it may be that
17 the board looked over that piece, but I can't recall.
18            Thank you.
19            MR. HARRINGTON:  This is 46?
20            THE REPORTER:  Correct.
21            (WHEREUPON, Exhibit 46 was marked for
22 identification.)
23            THE REPORTER:  Exhibit 46 marked.
24 BY MR. HARRINGTON:
25       Q.   Ms. Chambers, you have been handed Exhibit 46 to

1  right?  So it is saying -- it's creating some -- some
2  boundaries.  Again, if we were to pay out LTIP, which is
3  conditional on behavior and employment and performance, then
4  this would be the envelope that would be paid out.
5  BY MR. HARRINGTON:
6      Q.   Well, but this doesn't say subject to a
7  discretionary decision.  It simply says, we will prorate the
8  owed LTIP for time worked; does it not?
9      A.   It's implied in the LTIP program, it's only paid
10 out if someone is employed and performing well. So it's not
11 stated here, but it's implied by the -- by the program
12 design.
13     Q.   I see.  But the document doesn't say any such
14 thing.
15     A.   I don't think it needs to.  The LTIP program is
16 fairly well-known.
17     Q.   I see.  But it's talking about paying him out for
18 four months of LTIP.
19     A.   We were looking at a proposal, and the proposal
20 included paying him out for that amount.
21     Q.   For -- by way -- and I guess what it's doing is
22 it's prorating the owed LTIP, is what it says here.
23     A.   The proposal that we were looking at that this
24 document was -- was pulling together was pulling together a
25 total compensation package.  An element of that would be to

1  prorate the LTIP for the time he was in the role of four
2  months.
3       Q.   But again, it doesn't say prorate the LTIP. It
4  says prorate the owed LTIP.  Your -- that's your reading of
5  it, that --
6       A.   I think it's --
7       Q.   -- it should say prorate the --
8       A.   I think it's wrong word.  Again, LTIP is -- it's
9  conditional on performance and employment.
10      Q.   You disagree with the use of the word "owed" in
11 this document; would you say?
12      A.   Look, I think it's implied -- implying something
13 that it shouldn't imply, so I would not have used the word
14 "owed." I did not write the document.
15      Q.   The LTIP plan, are you aware -- you can strike
16 that.
17           If you look down below, in the next section of
18 bullet points, it says, "There is no expectation that the
19 role will extend beyond March 2025." Was that your
20 understanding in April of 2024?
21      A.   That sentence is confusing to me, actually. Let me
22 see if there's some context in here.  That date doesn't make
23 sense to me, because we were talking about -- hang on.  I'm
24 trying to think about timing. Yeah.  So again, Steve and I
25 were discussing a smaller role.  We were discussing roll out

```
 1                        DECLARATION
 2   Deposition of: Laura Chambers    Date: 05/21/2025
 3   Regarding: Steve Teixeira vs Mozilla Corporation, et al.
 4   Reporter:  Vanessa Estes-Ezell
 5   _____
 6
 7   I declare under penalty of perjury the following to be
 8   true:
 9
10   I have read my deposition and the same is true and
11   accurate save and except for any corrections as made
12   by me on the Correction Sheet herein.
13
14   Signed at _____, _____
15   on the _____ day of _____, 20____.
16
17
18
19
20
21
22
23
24              Signature: _____
25                           Laura Chambers
```