# EXHIBIT 18




UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

STEVE TEIXEIRA,

    Plaintiff,

v.                         Case No.: 2:24-CV-01032

MOZILLA CORPORATION a.k.a. M.F. Technologies, a California corporation; MOZILLA FOUNDATION, a California public benefit corporation; LAURA CHAMBERS and her marital community; WINIFRED MITCHELL BAKER and her marital community, and DANI CHEHAK and her marital community,

    Defendants.

CONFIDENTIAL

VIDEOTAPED DEPOSITION OF

DANI CHEHAK

TAKEN ON

THURSDAY, MAY 22, 2025

8:34 A.M.

DLA PIPER US LLP

555 MISSION STREET, SUITE 2400

SAN FRANCISCO, CALIFORNIA 94105



```
 1  move forward?
 2              MS. TOUSCHNER:  Yes.  I do.
 3              THE REPORTER:  Mr. Redmond, do you agree to move
 4  forward?
 5              MR. REDMOND:  I do.
 6              THE REPORTER:  Ms. Cates, do you agree to move
 7  forward?
 8              MS. CATES:  I do.
 9              THE REPORTER:  I don't think we have Mr. Durham
10  today.  I don't have Ms. Alexander.
11              And, Ms. Perez-Vargas, do you agree to move
12  forward?
13              MS. PEREZ-VARGAS:  I do.
14              THE REPORTER:  Ms. Nobe, do you agree to move
15  forward?
16              MS. NOBE:  I do.
17              THE REPORTER:  And, Mr. Torres, do you agree to
18  move forward?
19              MR. TORRES:  I do.
20              THE REPORTER:  All right.  Will the witness please
21  raise your right hand.  Do you affirm under penalty of
22  perjury that the testimony you're about to give will be the
23  truth, the whole truth, and nothing but the truth?
24              THE DEPONENT:  I do.
25              THE REPORTER:  Thank you.
```

1  Q. Do you know if anyone else worked on it with Ms.
2  Chambers?
3  A. I bet -- I bet Mitchell did.
4  Q. Do you know whether she did?
5  A. I don't know.
6  Q. What makes you think that you bet Mitchell had
7  worked with Laura -- Laura Chambers on Steve Teixeira's 2023
8  performance review?
9  A. That'd be a really good practice and the right --
10 right thing I would have suggested.
11 Q. Would that have been consistent with Laura and
12 Mitchell's practice around that time?
13 A. Yes.
14 Q. Because they were continuing to coordinate after
15 Laura had taken on the role of CEO?
16 A. Yeah, and this hand-off for a little period of
17 time.
18 Q. How long was that period of time?
19 A. Six, eight weeks, maybe.
20 Q. On the last page of your notes regarding your May
21 2nd, 2024, conversation with Steve Teixeira, You write, "How
22 could you work for a company that you swear discriminates
23 against you,"?
24 A. Yeah.
25 Q. It sounds like you can't understand why would he

1  would continue to work at Mozilla after this experience?
2       A.   Yeah, I think we were, you know, really, kind of
3  -- as you go through it, and, you know, I'm kind of saying
4  throughout the whole thing, like, maybe it's different than
5  you think.  Maybe you go get some clarity.
6            You know, Steve says you're gas lighting.  I mean,
7  this whole thing was really tough.  And then I just said,
8  you know, Steve, I don't think that happened, because I
9  don't think you would, I don't think I could, nobody could
10 work for a company that we think discriminated against us.
11      Q.   You're trying to reason with him?
12      A.   Yeah, I mean --
13      Q.   And when you say, how could you work for a company
14 that you swear discriminates against you, it makes it sound
15 like you're telling him if he really thought he was
16 discriminated against, he should quit?
17      A.   No.  I could have been even, like, how could I?
18 How could -- you know, like, I just don't think --
19      Q.   Yeah, well, you wonder how he could continue
20 working --
21           MR. TODARO:  Hold on, please let her finish her
22 answers.
23 BY MR. HARRINGTON:
24      Q.   Do you have more of your answer?
25      A.   I do.

1  Q. Go ahead.
2  A. Is that okay? Yeah, I'm just -- I'm like, you
3  know, I'm trying to say, Steve, I think -- I think we can
4  seek the truth, right, in this document. I also say, can't
5  we go back and like, understand your perspective, understand
6  Mozilla's perspective, find a middle ground, see, you know,
7  maybe all -- all the data, you know, out there and have a
8  conversation. I can find that in here.
9  Q. Yeah. My question is about this particular line
10  --
11  A. Yeah.
12  Q. "How could you work for a company that you swear
13  discriminates against you,"? You know, the implication is a
14  principled person would not continue to work for a company
15  that discriminated against them, isn't it?
16  A. No, I think and that's why I'm trying to put it in
17  the context of the whole conversation. And he said, "I
18  don't think we're going to agree and don't have to," like --
19  that -- how this all happened. And then he goes on to say,
20  you know, and he's being gas lit. I mean, this is just like
21  -- and I'm just saying, hey, Steve, maybe it's different
22  than that, right.
23         Because you want to stay. He kept saying, you
24  tell me, you tell me, and I was like, well, I don't know.
25  What do you want to do? And he's like, well, you all tell

1  me, you know, I'm able to work.  And I was just, kind of,
2  like, hey, Steve, like, I think it's a different story than
3  what you have.
4             And I said, you know -- and I remember thinking,
5  like, how -- how -- like, why would you want to be here if
6  you felt this way about us?  Like -- like -- and I -- I
7  remember thinking, like, if I felt this way about someone, I
8  wouldn't want to be here.
9      Q.    Right.
10     A.    And he said, then he said he'd be fine with it.
11     Q.    Right.  You you wouldn't want to be there if you
12 had been discriminated against --
13     A.    Yeah.
14     Q.    -- because that would be untenable?
15            THE REPORTER:  That would be?
16            MR. HARRINGTON:  Untenable.
17            THE DEPONENT:  I think would it would be horrible
18 --
19 BY MR. HARRINGTON:
20     Q.    That's how you would feel?
21     A.    That's how I would personally feel.  If I -- if I
22 felt this strongly, I'd first, I mean, you're asking my
23 opinion about what I would do if it were me. I -- I'd go
24 find out, like, why do I see it so differently than someone
25 else?

```
 1      A.   -- time frame.
 2      Q.   -- after the comms went out --
 3      A.   Yeah.
 4      Q.   -- for his leave, right?
 5      A.   Yeah.
 6      Q.   Exhibit 69 would have been sent out sometime
 7   around or after May 28th, 2024?
 8      A.   Uh-huh.
 9      Q.   And were his -- was Mr. Teixeira's Slack access
10   revoked around that same time?
11      A.   I can't remember the date, but you probably have
12   something that says the date when it was revoked?
13      Q.   I'm asking based on your memory.
14      A.   Not on my memory.  I don't have a memory of the
15   exact dates.
16      Q.   Okay.  But you're aware that at some point after
17   he was put on leave, he lost access to company systems?
18      A.   Yes.
19      Q.   Around that same date, May 28th, 2024?
20      A.   In -- around a date.  But again, I don't -- my
21   memory doesn't have the dates.
22      Q.   Steve writes in Exhibit 69 this Slack message,
23   "All I can say right now is I'm physically fine to work."
24   Did you understand that to be true that he was physically
25   fine to work?
```

1              And then after we get LTIP payouts, they
2    administer the payroll.
3         Q.   The compensation team, is that somebody in your
4    organization?
5         A.   It is.
6         Q.   I see.  That's distinct from the compensation
7    committee of the board?
8         A.   Uh-huh.
9              THE REPORTER:  Is that a yes?
10             THE DEPONENT:  Correct.  It's a team that does
11   comp and ben for me.  Benefits, sorry.
12   BY MR. HARRINGTON:
13        Q.   And who makes decisions regarding the LTIP
14   program?
15             MR. TODARO:  Object to form.
16             THE DEPONENT:  What kind of decision?
17   BY MR. HARRINGTON:
18        Q.   You know what, I'll return to that in a moment.
19   Do you know why Mr. Teixeira only received half his bonus in
20   2023?
21        A.   Now, we're back to the executive IAP?
22        Q.   Yeah.  Yeah.  The executive IAP.
23        A.   It was the 50 percent rating.
24        Q.   Based upon his performance review?
25        A.   Based upon the recommendation of Laura that I took

1  to the board and the board approved.
2      Q.   Right.  Why did Mr. Teixeira not receive his LTIP
3  bonus for 2024?
4      A.   LTIP bonuses were paid out in February of 2025.
5  And if we refer to the plan, he wasn't paid out due to the
6  terms of the plan.
7      Q.   Which terms?
8      A.   Yeah, the terms of the plan will say when you're
9  eligible to get a payout, and the only place you're eligible
10 to get a payout if you're not employed is if it is
11 involuntary, not for cause.
12     Q.   Right.  And has Mozilla invoked the cause
13 provision to withhold LTIP payments otherwise owed to Mr.
14 Teixeira?
15          MR. TODARO:  Object to form.
16          You can answer.
17          THE DEPONENT:  I'm not sure.
18 BY MR. HARRINGTON:
19     Q.   Has Mozilla invoked cause and asserted that Mr.
20 Teixeira should not get his LTIP bonus because of a cause
21 determination?
22     A.   It didn't pay out because in the plan, you must be
23 employed, unless it was involuntary, not for cause.
24     Q.   Right?
25     A.   So, you're asking me to connect that since he

1  didn't get paid it, they've invoked it?
2      Q.   Right?
3      A.   If you attached to those two things, I would
4  imagine.
5      Q.   Now, I mean, if he had been terminated not for
6  cause --
7      A.   Uh-huh.
8      Q.   -- he would have been paid out his -- a pro-rated
9  LTIP bonus at least through September 1st when -- his last
10 day of work, right?
11     A.   Correct.
12     Q.   All right.  So, what you're arguing to me is that
13 he didn't get paid the LTIP bonus, and therefore, you infer
14 that his termination was for cause?
15     A.   I think that's what -- is that what you're asking
16 me?
17     Q.   Yeah.
18     A.   Yes.
19     Q.   Okay.  Because otherwise, if he had been
20 terminated not for cause, the LTIP bonus would be owed, in
21 your view, through -- at least a pro rated amount would be
22 owed for the time he worked through September 1st?
23     A.   Per of the plan.
24     Q.   I guess, how can he have been terminated for cause
25 if you were proposing that he stay on through 12-31 in a

1  different role?
2              MR. TODARO:  Object to form.
3              THE DEPONENT:  Yeah.
4              THE REPORTER:  What was that?
5              MR. TODARO:  Object to form.
6              THE DEPONENT:  I think they are two different
7  things, right?  I think -- yeah, I think they're two
8  different things.  They're not attached to each other,
9  right.  We would have loved to have found Steve a new role.
10 And that role was looking like through 12-31.
11             And then there's the period of administrative
12 leave.  They couldn't come to an agreement on a new role,
13 and then there's the termination.  So, I think they're --
14 they're two things.
15 BY MR. HARRINGTON:
16    Q.   Well, for him to be terminated for cause, that
17 would imply performance reasons or a performance problem,
18 right?
19             MR. TODARO:  Object to form.
20 BY MR. HARRINGTON:
21    Q.   Do you know why someone can be terminated for
22 cause under the agreement?
23    A.   I think you have to -- if we find the agreement,
24 it'll have a definition.
25    Q.   Do you remember, as you sit here?  I'll tell you

1  that it -- I -- it may have been produced at the 11th hour
2  before this deposition, but I don't have it here with me.
3       A.   I would pull it because it is legal language.
4  And I'd want to give you the exact language.
5       Q.   Well, tell me what you understand -- let me ask
6  this: Are you aware of anyone else ever not having their
7  LTIP onus paid out for reasons of cause?
8       A.   No.
9       Q.   That Steve Teixeira is the first time that that
10 has happened in your experience with the company?
11      A.   Yes.
12      Q.   So, what is it that makes Steve Teixeira unique
13 here?  Why -- why was he terminated for cause, in your view
14 under the LTIP agreement?  And let me start that over.  I
15 mean, do you understand, under the LTIP program, what
16 constitutes cause?
17      A.   It's in the plan document, and that's where it's
18 the legal language, I would -- I would want to read you word
19 for word.
20      Q.   All right.  And is it basically a performance
21 determination?
22           MR. TODARO:  Object to form.
23           THE DEPONENT:  There's multiple things, I think in
24 the for cause definition.
25 BY MR. HARRINGTON:

1  Q.   I see.  Is one of them --
2  A.   And the not for cause definition --
3  Q.   -- not performance related?
4       THE REPORTER:  Sorry, one at a time.
5  BY MR. HARRINGTON:
6  Q.   Is one of the components of the for cause
7  definition in the LTIP plan related to performance?
8  A.   Again, I'd really love to get the language that it
9  says --
10 Q.   Me too.
11 A.   -- so I could give you to specific answer.
12 Q.   Are you aware that that is -- that they are
13 performance related provisions in the LTIP document?
14 A.   They're performance related, I can say for
15 certain, in regards to the company's performance.
16 Again, it's a program based on the company's performance
17 against those KPIs, not an individual.  I'd want to look at
18 that for cause definition so we could be really accurate
19 with each other.
20 Q.   So, the company considers there to have been cause
21 to terminate Mr. Teixeira.  Is that fair to say, at least in
22 terms of the LTIP program?
23 A.   I -- I think we just talked about it, that I think
24 you're saying to infer that if he didn't get paid, it was
25 for cause --

1       Q.    Right.
2       A.    -- and I said, yes.
3       Q.    Right.  Yes.
4       A.    The legal team, you know, managed that part of the
5   work.  So, I'm just going back to the attachment of the two
6   things and inferring that they belong together.
7       Q.    I see.  The legal team was involved in deciding
8   whether cause existed to withhold an LTIP payment -- a pro-
9   rated LTIP payment for Steve's final year?
10      A.    Yeah, it's a legal document, and so they, you
11  know, read the -- read the language and also consult, I'm
12  sure, with external Counsel.
13      Q.    What has to happen in a typical year for a typical
14  executive for an LTIP payment to be made to them?  How does
15  that happen -- how does that -- how is that affected within
16  the company?
17      A.    Can you help me understand?  Are you looking for
18  process?
19      Q.    Yeah, what's the process for, say, some other
20  member of the steering committee, an executive, who may have
21  an entitlement to LTIP bonus, how does that come to be?  How
22  do they get paid?
23      A.    Okay.  So, back to that January board meeting we
24  have every year.  And why don't I start with how we do it
25  going forward.  So -- not going forward, but we'll start at

DANI CHEHAK / 84536                          May 22, 2025                          317 Confidential

```
 1                         DECLARATION
 2   Deposition of: Dani Chehak    Date: 05/22/2025
 3   Regarding: Steve Teixeira vs Mozilla Corporation, et al.
 4   Reporter:  Vanessa Estes-Ezell
 5   _____
 6
 7   I declare under penalty of perjury the following to be
 8   true:
 9
10   I have read my deposition and the same is true and
11   accurate save and except for any corrections as made
12   by me on the Correction Sheet herein.
13
14   Signed at _____, _____
15   on the _____ day of _____, 20____.
16
17
18
19
20
21
22
23
24             Signature: _____
25                        Dani Chehak
```

(800) 528-3335  NAEGELI DEPOSITION & TRIAL — Established 1980 —  NAEGELIUSA.COM